## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** *ex rel.* **[UNDER SEAL],**<br><br>          **Plaintiff,**<br><br>v.<br><br>**[UNDER SEAL]**<br><br>          **Defendant.** | **Civil No.  _____**<br><br><br><br>**Filed Under Seal Pursuant to 31 U.S.C. § 3730(b)(2)** |

### COMPLAINT AND JURY DEMAND

# FILED UNDER SEAL

# NOT TO BE FILED
# ON PACER

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **Plaintiff,** | **Civil No.  _____** |
| *ex rel.* | **COMPLAINT** |
| **NICOLAS MORENO**<br>**10717 Wolcott Place**<br>**Mission Hills, CA 91345** | **Jury Trial Demanded**<br><br>**Filed Under Seal Pursuant to**<br>**31 U.S.C. § 3730(b)(2)** |
| **Relator,** | |
| **v.** | |
| **WELLS FARGO BANK, N.A.**<br>**420 Montgomery Street**<br>**San Francisco, CA 94104** | |
| **Defendant.** | |

**COMPLAINT AND JURY DEMAND**

Relator Nicolas Moreno, through his undersigned attorneys and on behalf of the United States of America, brings this *qui tam* action under the False Claims Act, 31 U.S.C. § 3729 *et seq.*, against Wells Fargo Bank, N.A., to recover damages and civil penalties arising from false or fraudulent statements, records, and claims made or caused to be made by Wells Fargo or its agents and employees to the United States Government, arising out of Wells Fargo's participation in the U.S. Treasury Department's Home Affordable Modification Program (HAMP) from March 2010 through HAMP's expiration in December 2016, and its participation in other federal programs which exist to protect homeowners from mortgage defaults and foreclosures.

2

1.      Following the devastation inflicted on the American home mortgage market by the 2007-2008 financial crisis and recession, Congress authorized programs to prevent foreclosures and maintain homeownership through various methods including modification of mortgage principal and reduction of interest payments. The United States implemented these "loss mitigation" programs through the federal agencies that participate in the secondary mortgage market, including Fannie Mae and Freddie Mac, and contracted with mortgage services such as Wells Fargo to provide incentive payments for each successful loss mitigation by a servicer. Under its servicer participation agreements with the United States, in order to receive any incentive payments, Wells Fargo had to agree to provide "all services required to be performed by a participating servicer," including consideration of all appropriate mortgage holders for assistance under HAMP or other loss mitigation program for homeowners.

2.      Wells Fargo, by contract, statute, and regulation, was required to comply with all programmatic guidance for mortgage servicers issued by the Treasury Department, Fannie Mae, Freddie Mac, the Federal Housing Administration, and the Veterans Benefit Administration. Wells Fargo was required to obtain and review documentation and information from borrowers that established their eligibility for a modification of their loan or other loss mitigation under HAMP, and their eligibility for other loss mitigation programs offered by the federal agencies. These requirements were material to Wells Fargo's servicer participation agreements with the United States under which it received incentive payments for participating in HAMP and other loss mitigation programs.

3.      From March 2010 through HAMP's expiration in December 2016, Defendant Wells Fargo failed to abide by the program requirements of HAMP and other federal loss mitigation programs because Wells Fargo:

    a.   Failed to review loans for HAMP already reviewed for Wells Fargo's proprietary loss mitigation program.

    b.   Entirely failed to review loans for HAMP eligibility from March 2011–September 2011.

    c.   Manipulated and falsified borrower income data in order to remove loans from the loss mitigation queue and meet "removal" quotas.

    d.   Falsified notes taken during court mediation hearings in order to conceal Wells Fargo's failure to collect required borrower information.

    e.   Falsified HAMP applications and borrower signatures, also done in order to conceal its failure to collect required borrower information and obtain borrower approvals.

    f.   Failed to review financial documents obtained from borrowers and structured underwriters' court mediation call workflow so as to prevent them from reviewing borrower documents prior to court mediation.

4.     Despite these violations of material requirements of its HAMP Servicer Participation Agreement with the United States, which were also violations of statutes and regulations governing servicers of federally-insured and -issued home mortgage loans, Wells Fargo submitted claims for HAMP and other servicer incentive payments from the United States. Because Wells Fargo failed to meet the material requirements of its contract to receive incentive payments for carrying out the United States' loss mitigation program, these claims were false and fraudulent and violated the federal False Claims Act.

## I.    JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 and 31 U.S.C. § 3732. The False Claims Act, 31 U.S.C. § 3732, confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. § 3730.

6.      This Court has personal jurisdiction over Defendant pursuant to 31 U.S.C.

§ 3732(a), which authorizes nationwide service of process and because Defendant transacted

business in this District and committed acts proscribed by 31 U.S.C. § 3729 in this District.

7.      Venue is proper in the District of Columbia pursuant to 31 U.S.C. § 3732(a)

because Defendant transacted business in this District and committed acts proscribed by 31

U.S.C. § 3729 in this district.

8.      In accordance with 31 U.S.C. § 3730(b)(2), this Complaint has been filed under

seal and will remain under seal for a period of at least sixty (60) days from its filing date, and

shall not be served upon the Defendant until after the Court so orders.

## II.     PARTIES

9.       Relator Nicolas Moreno has undergraduate and master's degrees in accounting.

Since 2011, he worked as both an underwriter and analyst of consumer loans.

10.      Defendant Wells Fargo Bank, N.A. is a national bank with its principal place of

business in San Francisco. Wells Fargo Bank, N.A. is the parent company of Wells Fargo Home

Mortgage, a mortgage lender headquartered in Des Moines, Iowa, with branches and offices in

all 50 states.

## III.    APPLICABLE LAW

### A.     The False Claims Act

11.      The False Claims Act provides that any person who knowingly presents or causes

another to present a false or fraudulent claim to the Government for payment or approval is liable

for a civil penalty for each false claim or statement and three times the amount of the damages

sustained by the Government. The Act also creates liability for any person who knowingly makes

or uses false records or statements that are material to a claim for payment, and any person who

5

knowingly creates or causes to be created false statements or records to conceal, avoid, or decrease an obligation to pay or transmit money to the Government. 31 U.S.C. § 3729(a)(1)(A)-(B), (G).

12.    The False Claims Act's whistleblower provisions allow a person who has information regarding a false or fraudulent claim against the Government to bring an action for himself and on behalf of the United States, and to share in any recovery.

13.    This suit is not based upon prior public disclosures found with sources of allegations or transactions that are encompassed by the definition of the term "publicly disclosed" under 31 U.S.C. § 3730(e)(4)(A), as amended by the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, § 1313(j)(2), 124 Stat. 901-902 (2010).

14.    To the extent that a public disclosure has occurred, Mr. Moreno is an original source under the FCA, as defined under 31 U.S.C. § 3730(e)(4)(B). Mr. Moreno possesses direct and independent knowledge of the information as a result of his Wells Fargo employment. Mr. Moreno voluntarily and affirmatively disclosed the allegations herein to the United States Government prior to filing this Complaint. *Id.* § 3730(e)(4).

15.    Defendant concealed its violations of law and false claims submitted for payment from the United States on a continuing and ongoing basis, resulting in the United States not knowing of the violations despite its due diligence, until Relator disclosed them to the United States in 2019.

**B.    Relevant housing statutes and regulations**

      i.    Emergency Economic Stabilization Act of 2008 (EESA)

16.    Congress passed the Emergency Economic Stabilization Act (EESA) on October 3, 2008 in response to the 2007-2008 financial crisis and subprime mortgage crisis. EESA provided authority for the federal government to purchase and insure certain types of troubled

6

assets for the purposes of providing stability and preventing disruption in the economy and financial system and protecting taxpayers. Pub. L. No. 110-343, 110 Stat. 3765.

17.     The 2008 EESA created the Troubled Assets and Relief Program ("TARP"). 12 U.S.C. §§ 5211-5241. TARP's purpose was to enable the government to purchase troubled assets and to make and fund commitments to purchase troubled assets from any financial institution. 12 U.S.C. § 5211. EESA instructed the Treasury Secretary to take into consideration the need to help families keep their homes and to stabilize communities when purchasing troubled assets under TARP. 12 U.S.C. § 5213.

18.     EESA required implementation of a plan to maximize assistance for homeowners, including using the Treasury's authority to encourage mortgage servicers to participate in the HOPE for Homeowners Program under the National Housing Act and other available programs to minimize foreclosures. 12 U.S.C. § 5219. In addition, the Treasury Secretary was empowered to use loan guarantees and credit enhancements to facilitate loan modifications to prevent avoidable foreclosures. *Id.*

19.     EESA defined "federal property managers" to include the Federal Deposit Insurance Corporation ("FDIC"), Federal Reserve Board, the Federal Housing Finance Agency (FHFA), in its capacity as conservator of Government -sponsored enterprises (GSEs), specifically, the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac"). 12 U.S.C. § 5220(a)(1)(A).

20.     EESA provided legal authority for federal property managers to implement a plan to maximize assistance to homeowners, using their authority to encourage servicers of underlying mortgages to take advantage of the HOPE for Homeowners Program or other available programs to minimize foreclosures. 12 U.S.C. § 5220(b)(1)

21.     Residential mortgage loan modifications permitted under EESA included reduction in interest rates, reduction of loan principal, and similar modifications. 12 U.S.C. § 5220(b)(2).

   ii. <u>Helping Families Save Their Homes Act of 2009</u>

22.     The Helping Families Save Their Homes Act of 2009 (Homes Act) was enacted on May 20, 2009 for the purpose of preventing mortgage foreclosures and enhancing mortgage credit availability. Pub. L. No. 111-22, 123 Stat. 1632. The Homes Act amended the Truth in Lending Act to give mortgage servicers authorization to modify mortgage loans and engage in other loss mitigation activities consistent with applicable guidelines issued under EESA. 15 U.S.C. § 1639a. This amendment created a safe harbor for mortgage servicers to consider mortgage loans for a qualified loss mitigation program and not be held liable by investors in the mortgage loans.

23.     The Homes Act made several relevant changes to federal housing law. The Homes Act amended the Housing Act of 1949 to include a provision for loss mitigation and payment of partial claims for Guaranteed Rural Housing Loans. 42 U.S.C. § 1472(h). The Homes Act amended Section 257 of the National Housing Act, specifically providing additional loss mitigation options for mortgage loans insured under the HOPE for Homeowners Program. 12 U.S.C. § 1715z-23. The Homes Act amended Section 230 of the National Housing Act specifically providing additional loss mitigation options for mortgage loans insured by HUD (FHA Insured Loans). 123 Stat. at 1645, 12 U.S.C. § 1715u.

**C. HAMP and other loss mitigation programs**

   i. <u>Home Affordable Modification Program (HAMP)</u>

24.     HAMP is a national mortgage modification program providing eligible borrowers the opportunity to modify mortgage loans to make them more affordable, authorized by Congress

as part of TARP. 12 U.S.C. §§ 5219-5220. HAMP was part of the Making Home Affordable (MHA) Program in 2009. The Treasury Department issued uniform guidance for loan modifications under HAMP on March 4, 2009. Except for certain FHA-insured loans, HAMP expired on December 31, 2016.

25.     The Government Sponsored Enterprises ("GSE"), Fannie Mae and Freddie Mac, are entities that were created and authorized by Congress to purchase mortgages from lenders and either hold them or package them into securities to be sold to investors. In doing so they provide liquidity to the home mortgage market, and enable affordable and stable family homeownership.

26.     Fannie Mae and Freddie Mac were directed through their respective servicing guides and bulletins to implement HAMP with respect to mortgage loans owned, securitized, or guaranteed by Fannie Mae or Freddie Mac ("GSE loans"). Fannie Mae 2010 Servicing Guide Update Part VII and Part VIII, April 2010, 706-53 (requiring that "All servicers must participate in HAMP for all eligible mortgage loans held in Fannie Mae's portfolio. . ."); Freddie Mac 2010 Servicing Guide Update Chapter B65, B65.1 ("A Borrower must first be considered for a modification under the federal government's Home Affordable Modification Program (HAMP) in accordance with the requirements of Chapter C65.").

27.     Servicers of loans owned by Fannie Mae were required to follow the programmatic guidance contained in the Fannie Mae Servicing Guide under their servicing agreements with Fannie Mae. Servicers of loans owned by Freddie Mac were required to follow the programmatic guidance contained in the Freddie Mac Servicing Guide under their servicing agreements with Freddie Mac. Compliance with the contractually-incorporated Servicing Guides is a material requirement for receiving incentive payments for servicing GSE loans.

28.     HAMP required mortgage servicers to register and sign a Servicer Participation Agreement (SPA) with Fannie Mae, the latter serving as Financial Agent of the United States, if they wanted to participate in the MHA program and consider mortgage loans that were not GSE Loans for HAMP.

29.     Effective March 19, 2010, Wells Fargo entered into a Commitment to Purchase Financial Instrument and Servicer Participation Agreement ("SPA") with Fannie Mae with a maximum value of $6.4 billion in potential incentive compensation for participation in HAMP.

30.     The SPA required the mortgage servicer to consider borrowers for all programs under HAMP pursuant to the required guidelines for the programs. SPA, Section 2, Paragraph A. ("Servicer shall perform the Services for all mortgage loans it services, whether it services such mortgage loans for its own account or for the account of another party, including any holders of mortgage-backed securities.")

31.     The SPA Service Schedule A-1 required Wells Fargo to perform all services required by the MHA program documentation for non-GSE loans, including all obligations related to the modification of first lien mortgage loans and the provision of loan modification and related foreclosure prevention services. All material programmatic guidance for servicers of non-GSE mortgage loans participating in the MHA program was contained within the MHA Program Handbook for Servicers of Non-GSE Mortgages.

32.     In executing Service Schedule A-1 of the SPA, Wells Fargo agreed to perform all services as set forth in the MHA Program Handbook.

ii.     <u>Federal Housing Administration and Veterans Affairs loss mitigation programs</u>

33.     The Federal Housing Administration's (FHA) Single Family Housing Policy Handbook 4000.1 is a consolidated, consistent and comprehensive source of FHA Single Family Housing policy including loss mitigation guidelines for FHA insured mortgage loans. Authority

for the FHA loss mitigation program and issuance of the guidelines is provided by 12 U.S.C. § 1715u and 24 C.F.R. § 203.501. Prior to the publication of the Handbook, FHA's loss mitigation program policies were set forth in FHA Mortgagee Letter 00-05.

34.     As an FHA-insured loan servicer, Wells Fargo is required to perform all services as set forth in the FHA Single Family Housing Policy Handbook 4000.1. Prior to the Handbook's publication, Wells Fargo was required to follow the FHA policies regarding loss mitigation set forth in Mortgagee Letter 00-05.

35.     Service Schedule A-3 to the SPA was executed by Wells Fargo and Fannie Mae on September 30, 2010. Service Schedule A-3 memorialized Wells Fargo's election to participate in the FHA-HAMP program and required Wells Fargo to perform all services required by the FHA Single Family Housing Policy Handbook 4000.1, including those related to modification of first lien mortgage loans and provision of loan modification and foreclosure prevention services.

36.     The Veteran Affairs (VA) Servicer Handbook M26-4 is a consolidated, consistent and comprehensive source of VA Guaranteed Loan Servicing policy including loss mitigation guidelines for VA guaranteed mortgage loans. Authority for the VA Loan loss mitigation and loan modification program is provided by VA regulation, including 38 C.F.R. § 36.4315.

37.     As a servicer of VA guaranteed loans, Wells Fargo is required to perform all services as set forth in 38 C.F.R. § 36.4315 and the VA Servicer Handbook M26-4.

**D.     Wells Fargo's Incentive Compensation for Loss Mitigation Protection Programs**

   i.   HAMP Incentive Compensation for non-Fannie Mae and Freddie Mac Loans

38.     HAMP provided Mortgage Servicers three incentive compensation programs for non-Fannie Mae/Fannie Mac mortgage servicers:

   a.   **Completed Modification Incentive**: Servicers received $1,000 for each completed HAMP modification where the borrower entered into a permanent modification agreement.

    b.  **Current Borrower Incentive**: Servicers received an additional $500 if the borrower entering into a permanent HAMP modification was current on the original mortgage loan.

    c.  **"Pay for Success" Incentive**. Servicers received special fees for a period of 3 years based on borrowers' lowered monthly mortgage payments when reduced through HAMP by 6% or more. Loans qualifying for this incentive had to remain in good standing and not be paid off when the incentive was paid. The fee was the lessor of $1,000 ($83.33/month) or 50% of the reduction in the borrower's monthly payment.

    ii.  <u>Freddie Mac Incentive Compensation for Loan Loss Mitigation</u>

39.    Freddie Mac began offering incentives for its own Standard loss mitigation program on or before November 15, 2010. Freddie Mac mortgage servicers were eligible for an $800 incentive payment for successfully completing a Loan Modification under Freddie Mac's Standard loss mitigation program. Freddie Mac Servicing Guide B65.8. Freddie Mac mortgage servicers were eligible for $500 incentive payments for successfully completing a Repayment Plan under Freddie Mac's Standard loss mitigation program. *Id.*

40.    In addition to Freddie Mac's own Standard loss mitigation program, Freddie Mac loans were also eligible for the same HAMP loss mitigation as non-GSE loans. Prior to October 1, 2011, Freddie Mac loan servicers were eligible for HAMP incentive payments including the Completed Modification Incentive, the Current Borrower Incentive, and the "Pay for Success" Incentive.

41.    Freddie Mac updated its HAMP incentive schedule on October 1, 2011. To qualify for the incentives, the mortgage servicer had to arrange for the borrowers to enter into a HAMP permanent modification agreement. The incentive payment was $1,600 for mortgages that were current, or less than or equal to 120 days delinquent at the time of the Trial Period Plan ("TPP") Effective Date, $1,200 for mortgages that were 121 to 210 days delinquent, and $400 for mortgages that were more than 210 days delinquent. Freddie Mac also updated its Standard

Modification loss mitigation option so that servicers received the same incentive payments as those offered for HAMP modifications effective January 1, 2012. Mortgage servicers also continued to be eligible for $500 incentive payments for successful Repayment Plans under Freddie Mac's Standard loss mitigation program.

42.     Effective April 4 2014, Freddie Mac mortgage servicers were no longer eligible for HAMP "Pay for Success" incentive payments. Mortgage servicers continued to be eligible for the same incentive payments for Freddie Mac Standard Modifications, but were now eligible for the following incentives for arranging for borrowers to enter into a HAMP permanent modification agreement: $2,100 for mortgages that were current, or less than or equal to 120 days delinquent at the time of the TPP Effective Date, $1,700 for mortgages that were 121 to 210 days delinquent, and $900 for mortgages that were more than 210 days delinquent. Mortgage servicers continued to be eligible for $500 incentive payments for successful Repayment Plans.

43.     Effective June 30, 2015 Freddie Mac updated its incentive fee schedule to eliminate incentive payments for mortgages modified more than twice.

            iii.   Incentive compensation for loss mitigation for Fannie Mae Loans

44.     Fannie Mae began offering incentives for its own loss mitigation program on or before April 28, 2010. Fannie Mae mortgage servicers were eligible for a $400 incentive for successful completion of a Repayment Plan and $800 for a successfully completed Loan Modification.

45.     In addition to Fannie Mae's own loss mitigation program, Fannie Mae loans were also eligible for the same HAMP loss mitigation as non-GSE loans. Servicers of Fannie Mae loans were eligible for HAMP loss mitigation incentive payments, including the Completed Modification Incentive, the Current Borrower Incentive, and the "Pay for Success" Incentive.

46.     Fannie Mae updated the incentive schedule for its own loss mitigation program on November 15, 2010, after which Fannie Mae servicers were eligible for an incentive payment of $400 for completing a successful Repayment Plan, as well as an incentive payment for completing a successful Loan Modification. The loan modification incentive payment was $1,600 for Fannie Mae mortgages that were current or less than or equal to 120 days delinquent at the time of the TPP Effective Date, $1,200 for Fannie Mae mortgages that were 121 to 210 days delinquent, and $400 for Fannie Mae mortgages that were more than 210 days delinquent. After November 12, 2014, Fannie Mae mortgage servicers were also eligible for these payments for completing modifications under various non-HAMP loss mitigation options, including Standard Modification, Streamlined Modification, Streamlined Post Disaster Relief Forbearance, and Cap and Extend Modification for Disaster Relief.

47.     Effective November 12, 2014, Fannie Mae mortgage servicers were no longer eligible for the "Pay for Success" incentive payments they had previously received under HAMP, but were now eligible for a $500 incentive payment for completing a successful HAMP Repayment Plan. Fannie Mae loan servicers were also eligible for increased incentives for modifying conventional mortgages under HAMP. Fannie Mae servicers received $2,100 for mortgages that were less than or equal to 120 days delinquent at the time of the TPP Effective Date, $1,700 for mortgages that were 121 to 210 days delinquent, and $900 for mortgages that were more than 210 days delinquent.

48.     After November 12, 2014, Mortgage servicers were eligible for an incentive payment of $500 for completing a successful Fannie Mae 2MP Modification.

     iv.   Incentive compensation for FHA insured loans

49.     FHA's loss mitigation program offers incentive payments for FHA loan servicers, although participation in the program is mandatory. 12 U.S.C. § 1715u; 24 C.F.R. § 203.501.

Prior to June 24, 2015, FHA lenders were eligible for an incentive payment of $100 for participation in the Special Forbearance program, and lenders with performance scores in the top 25% received $200. FHA lenders were eligible for an incentive payment of $500 following the modification of an eligible mortgage, $250 for processing a Partial Claim, and reimbursement of the actual cost of a title search not to exceed $250.

50.     FHA announced a new loss mitigation program under the MHA program, FHA-HAMP, on July 30, 2009. FHA lenders who participated in FHA-HAMP were eligible for an incentive payment of up to $1,250 following the borrower successfully modifying their loan under FHA-HAMP. Lenders were also eligible for reimbursement of the actual cost of a title search not to exceed $250.

51.     The 4000.1 FHA Single Family Housing Policy Handbook is the superseding guidance document regarding loss mitigation of FHA loans. FHA updated the handbook on March 1, 2017, making FHA-HAMP the only modification option for FHA mortgage loans.

v.     Incentive compensation for Veterans Administration- Insured Home Loans.

52.     The Veterans Administration administers its incentive payment program to encourage servicers to provide an opportunity for veterans to retain homeownership and avoid foreclosure. Mortgage servicers are eligible for an incentive payment upon successful completion of a loss mitigation option which meets VA regulatory requirements. 38 U.S.C. § 3720(a)(2).

53.     Incentive amounts for modification of VA loans are determined by the loss mitigation option and the mortgage servicer's tier ranking at the time the loss mitigation option is completed. Incentive amounts are at 38 C.F.R. § 36.4319.

## IV.   FACTUAL ALLEGATIONS

54.   Mr. Moreno began working in March 2011 as a Consumer Loan Underwriter I, at Wells Fargo Home Mortgage offices. Mr. Moreno's initial job was to underwrite Wells Fargo-serviced home mortgage loans that were the subject of court-ordered mediation.

55.   Mr. Moreno's underwriting duties were:

a.   Reviewing documents submitted by borrowers for accuracy and completeness in order for Wells Fargo to consider borrowers for loss mitigation;

b.    notifying borrowers when additional documentation was required in order to consider the loan for loss mitigation options;

c.   applying investor guidelines to consumer loans and borrowers' financial documentation in order to determine eligibility for loss mitigation;

d.    notifying borrowers of Wells Fargo's determination regarding their eligibility for loss mitigation options available to them; and

e.    representing Wells Fargo in court-ordered mediations in order to explain Wells Fargo's determination regarding borrowers' eligibility for loss mitigation.

56.   Although Wells Fargo was required by law and its contract, under the MHA programmatic guidance and the SPA, to consider borrowers' HAMP eligibility, prior to June 2012 only a single underwriter in the Wells Fargo Fort Mill office was a HAMP reviewer.

57.   When initially beginning work as an underwriter, Mr. Moreno received approximately two days of training from his department's work director. His work director focused on familiarizing him and other new hires with the CPI system, Wells Fargo Home Mortgage's main computer system. Next, Mr. Moreno participated in two days of "side-by-sides," on-the-job training where a new hire sits by another employee to observe processing procedures and ask questions.

58.     Wells Fargo Home Mortgage underwriters were trained to consult the CLARA system. CLARA was a collection of one-page summaries of investors' guidelines for Wells Fargo-serviced mortgage loans. Wells Fargo authored the summaries. Underwriters did not have access to actual investor guidelines, nor any HAMP guidelines. Mr. Moreno was not trained on calculating a borrower's income or expenses until June 2012.

59.     Initially, Mr. Moreno and the other underwriters used an Excel spreadsheet to track consumer loans' eligibility for loss mitigation and calculate borrowers' eligibility for loss mitigation. On or about August 2011, the "HPA tool" was introduced to assist underwriters in determining consumer loan eligibility for loss mitigation options. Wells Fargo underwriters must update borrowers' information in the CPI system prior to using the HPA tool. The HPA tool automatically collected necessary information from the Wells Fargo Home Mortgage CPI computer system to compute whether the borrower was eligible for loss mitigation options.

60.     Wells Fargo Home Mortgage underwriters were not trained to use the HPA tool. When the HPA tool was not working, underwriters were directed to use their Excel spreadsheets to determine eligibility for loss mitigation by obtaining CPI system data, consulting information and borrowers' financial documents, and manually entering the data into Excel.

61.     On or about June 2012, Wells Fargo Home Mortgage underwriters began using the HPA tool to determine HAMP eligibility. The HPA tool still frequently broke down, but underwriters were told not to use Excel spreadsheets, but wait for the HPA tool to be functioning again before determining loan mitigation eligibility. In the interim, underwriters completed other tasks, such as ensuring borrowers' documents were current.

62.     From March 2011 to June 2012, Wells Fargo maintained between 100-120 loans in Mr. Moreno's pipeline to review for loss mitigation options, adding more loans to replace

loans that Mr. Moreno successfully removed. The borrowers for these loans were from Florida, Nevada, New York, Ohio, and Pennsylvania.

63.     From March 2011 through June 2012, Mr. Moreno represented Wells Fargo Home Mortgage in court-ordered mediation hearings, conducted by phone, for loans that were not previously assigned to him and with which he had no familiarity. The court-ordered mediation hearing calls went into a queue and were randomly assigned to an available underwriter. Wells Fargo intentionally set up the mediation call workflow to ensure that Wells Fargo underwriters were not able to review files in advance to be prepared for the mediations. As a result, during mediation hearings, underwriters fabricated reasons for why a loss mitigation determination was not yet made, thereby extending the time that borrowers stayed in the mediation process and, thus, unlawfully denying them a renegotiated mortgage loan under the HAMP program.

64.     Wells Fargo Home Mortgage underwriters had a target number of 15 to 20 "removals" to complete daily. "Removal" was eliminating a mortgage loan from the loss mitigation queue. This quota resulted in underwriters deliberately maximizing the number of denials of mortgage loans for loss mitigation, in order to receive a good performance review. A removal could be accomplished when an underwriter determined the borrower failed to provide requested documents within a week, the borrower did not completely fill out application materials, the borrower failed to accept or perform under a previously offered loss mitigation option, or the underwriter believed that the hardship reason was not valid.

65.     Wells Fargo Home Mortgage underwriters engaged in loss mitigation and HAMP review were not actually opening computer files and reading borrowers' documents to verify information in deciding that the borrower was not eligible for loss mitigation. Instead, underwriters relied on CPI system notes or the computer file label of an unopened document.

66.     Mr. Moreno observed underwriters falsifying HAMP applications from borrowers, and falsifying borrowers' signatures on those applications in order to supply missing information and thereby qualify the file for a "removal." Underwriters filled out false HAMP applications, signed them with a false borrower signature, and uploaded and inserted them into borrower files.

67.     Mr. Moreno observed underwriters manipulating the figures within the eligibility calculation (in the Excel spreadsheet) in order to obtain a certain outcome and thereby qualify the file for a "removal." Mr. Moreno observed underwriters denying borrowers eligible for HAMP modifications because borrowers had not accepted or performed under a previously offered proprietary modification, without a renewed HAMP evaluation. Mr. Moreno observed Wells Fargo Home Mortgage underwriters calling foreclosure attorneys to request attorney fee and cost numbers, rather than obtaining actual documented attorney information.

68.     From March 2011–June 2014, Mr. Moreno observed underwriters manipulating financial information to obtain a negative decision, based on underwriters' own subjective opinions about borrowers, for example that the borrower was rude during the mediation hearing, the borrower was living in the home for 60 months without making mortgage payments despite receiving rental income from a roommate, etc.

69.     Prior to June 2012, Wells Fargo Home Mortgage had no second level review of underwriters' loss mitigation eligibility decisions. The underwriters' unilateral decisions were final.

70.     From September 2011–May 2012, loans to be considered for HAMP were submitted to a single underwriter, but only if all required documentation for HAMP was provided or if the borrowers specifically requested HAMP consideration.

71.     From September 2011 through May 2012, the sole HAMP reviewer in the Wells Fargo Home Mortgage Fort Mills, North Carolina office declined the majority of the submitted mortgage loans for failure to provide required documentation. This HAMP reviewer told Mr. Moreno that she was not comfortable with her lack of knowledge of HAMP guidelines. In order to make herself look good to superiors, she preferred to decline a modification for missing documents rather than approving or declining a borrower for HAMP based on an actual loan review of borrowers' financial documents. This HAMP reviewer was ultimately promoted to a second level HAMP review team on or about April 2012.

72.     On or about February 2012, Wells Fargo began requiring underwriters to pass a multiple-choice test to process loss mitigation applications. The test's purpose was to evaluate underwriters' ability to correctly calculate borrower eligibility based on income.

73.     Many Wells Fargo underwriters cheated on the test, with full knowledge of their managers. Cheating on the test was easy because when a question was answered incorrectly, employees could exit the test and reopen it using a link provided, thereby allowing employees to correctly answer questions they previously answered incorrectly. The test was incapable of accurately measuring Wells Fargo underwriters' ability to calculate income for purposes of loss mitigation.

74.     In June 2012, Mr. Moreno was promoted to Consumer Loan Underwriter II. He was then exclusively assigned mortgage loans in active bankruptcy. The mediation hearing calls were scheduled and involved loans that Mr. Moreno had previously reviewed for loss mitigation options. Mr. Moreno was assigned approximately 50 loans to review for loss mitigation at a time and was to complete 20 loan reviews daily. Most of these assigned loans were in Florida.

75.     In June 2012, Mr. Moreno's Wells Fargo supervisory manager provided him with a booklet containing the required "waterfall," a series of required sequential stages for the loss mitigation process. The waterfall dictated that borrowers in loss mitigation were to be considered for HAMP first. If borrowers were not HAMP-eligible, they were to be considered for either the Proprietary program or a Private Banking program. Consumer loans owned and serviced by Wells Fargo were reviewed for the Proprietary program. Consumer loans serviced by Wells Fargo but owned by a third party entity were considered for the Private Banking program. The Private Banking program was governed by investor guidelines.

76.     At about this time, a second-level review process (SLR) was implemented for Wells Fargo's loss mitigation underwriting process, consisting of a higher-ranking underwriter reviewing the determination and confirming whether it was correct via SharePoint, a web-based collaborative platform. The SLR process required underwriters to answer 20 questions in the SharePoint system. The second-level reviewer then reviewed the answers and responded to the underwriters as to whether their determinations were acceptable, moderate, or material. Acceptable meant that the underwriter's determination was accurate pursuant to investor guidelines and no updates were required for a decision to be issued. Moderate meant that the reviewer had found an error in the income calculation but it did not impact the outcome and resulted in a deviation of less than 5% from the correct income. Material meant that underwriter's income calculation was over 5% deviant from the SLR calculation, which sometimes meant that the error had affected the outcome. Many times Mr. Moreno observed borrowers receiving inadequate reviews required by HAMP and other laws and therefore be rejected for HAMP modification because the SLR underwriter was not properly trained in order

to make their determination, or because mistakes that were determined to be material were not subsequently corrected.

77.     On June 25, 2018 Mr. Moreno emailed the Wells Fargo CEO Timothy Sloan, telling him that in his work he was aware of aware of Wells Fargo employees lying in mediations, falsifying borrower signatures, and appearing in court unprepared and with the intention of delaying the time to decide on loan modifications, among other allegations.

78.     Mr. Sloan responded and assigned Brian S. McDonough, a Vice President in Wells Fargo's Corporate Risk Conduct Management Office to contact Mr. Moreno. Mr. Moreno later spoke to Mr. McDonough and the other investigator, in approximately July 2018. A representative of the Wells Fargo Human Relations department and a Wells Fargo Senior Security Agent also followed up to discuss his disclosures. The last such conversation was on August 23, 2018.

## V.     CLAIMS FOR RELIEF

### COUNT I
### False Claims Act – Presentation of False Claims
### 31 U.S.C. § 3729(a)(1)(A)

79.     The allegations of the preceding paragraphs are re-alleged as if fully set forth below.

80.     Throughout its participation in HAMP, Wells Fargo did not review loss mitigation applications for HAMP eligibility that were submitted by borrowers who were previously offered a proprietary Trial Plan Offer.

81.     From approximately March of 2011 to June of 2012, Wells Fargo told borrowers that they were not eligible for loss mitigation under HAMP despite the fact that the borrowers'

financial documents were not submitted to the sole HAMP underwriter charged by Wells Fargo with determining eligibility for HAMP.

82.     Wells Fargo did not review loss mitigation applications by mortgagors for HAMP eligibility from March 2011 to September 2011. Wells Fargo only reviewed these applications for eligibility for Wells Fargo's proprietary loss mitigation programs.

83.     Wells Fargo's actions described in the preceding paragraphs were fraudulent, intentional, willful and wanton, not mere negligence.

84.     By failing to consider loss mitigation applications for HAMP eligibility as described above, Wells Fargo violated the material requirements of the SPA it executed in order to participate in the MHA program, from March 19, 2010 to the expiration of HAMP on December 31, 2016. Wells Fargo also violated the material requirements for Freddie Mac loan servicers seeking incentive payments set forth in Chapter B65.12 of the Freddie Mac Servicing Guide until March 1, 2016, and Chapter 9102.5(c) of the Freddie Mac servicing guide after that date. Wells Fargo also violated the material requirements for Fannie Mae loan servicers seeking incentive payments set forth in Chapter 4 Section 402 of the Fannie Mae servicing guide until November 11, 2014, and Chapter D2-3.2 of the Fannie Mae Servicing Guide after that date. Wells Fargo also violated the material requirements for FHA loan servicers seeking incentive payments set forth in the FHA guidelines found at Mortgagee Letter 00-05 and the FHA Single Family Housing Policy Handbook 4000.1(III)(A)(2)(j), which are required to be followed by FHA loan servicers under 12 U.S.C. § 1715u; 24 C.F.R. § 203.501. Wells Fargo also violated the material requirements for VA loan servicers seeking incentive payments set forth in 38 C.F.R. § 36.4315 and Chapter 5 of VA Servicer Handbook M26-4, which are required to be followed by VA loan servicers under 38 U.S.C. § 3720(a)(2).

85.     Despite violating these material requirements for servicers seeking incentive payments, Wells Fargo falsely certified that it had complied with the requirements and thereby submitted false claims for servicer incentive payments under its servicer agreements with the United States, in violation of the False Claims Act.

86.     Wells Fargo caused its underwriters to deny or delay loss mitigation for borrowers without verifying income or other necessary information. Wells Fargo caused its employees to falsify and manipulate borrower information so as to arbitrarily deny borrower eligibility for loss mitigation under HAMP and other federal programs. Wells Fargo caused its employees to fail to open and review financial documents obtained from borrowers when considering borrower eligibility for loss mitigation under HAMP and other federal programs. Wells Fargo caused its employees to advise borrowers that they were not eligible for loss mitigation under HAMP and other federal programs despite the fact that borrowers' financial documents had not been submitted to Wells Fargo in order to determine eligibility for loss mitigation. Wells Fargo's actions described in this paragraph were fraudulent, intentional, willful and wanton, not mere negligence.

87.     By intentionally failing to review borrower documentation, manipulating and falsifying borrower financial information, and falsely informing borrowers that they were ineligible for loss mitigation, Wells Fargo violated Chapter II Sections 4.6 and 5.1 of the MHA Handbook which state that a servicer must review the documentation provided by the borrower for completeness and which requires a servicer to verify a borrower's eligibility under HAMP by reviewing borrowers' financial documents. Wells Fargo also violated the material requirements for Freddie Mac loan servicers set forth in Chapters B65.13 and C65.5.1 of the Freddie Mac Servicing Guide until March 1, 2016, and Chapter 9102.5(c) of the Freddie Mac Servicing Guide

24

after that date. Wells Fargo also violated the material requirements for Fannie Mae loan servicers set forth in Chapter 6 of the Fannie Mae Servicing Guide until November 11, 2014 and Chapter D2-3.2 of the Fannie Mae Servicing Guide after that date. Wells Fargo also violated FHA guidelines found at Mortgagee Letter 00-05 and the FHA Guidebook 4000.1(III)(A)(2)(i)(iii)-(iv), which require that the borrower's documentation of income be reviewed and analyzed to determine the borrower's current and future ability to meet the monthly mortgage payment. Wells Fargo also violated the material requirements for VA loan servicers seeking incentive payments set forth in Chapter 5.06(a)(4) of the VA Servicer Handbook M26-4, which are required to be followed by VA loan servicers under 38 U.S.C. .§ 3720(a)(2).

88.     Despite violating these material requirements for servicers seeking incentive payments, Wells Fargo falsely certified that it had complied with the requirements and thereby submitted false claims for servicer incentive payment under its servicer agreements with the United States, in violation of the False Claims Act.

89.     Through the acts described above and otherwise, Defendant and its agents and employees knowingly presented or caused to be presented to the United States Government false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A).

90.     As a result of Defendant's conduct, the United States Government has been harmed by an amount to be determined at trial, and is also entitled to statutory penalties.

**COUNT II**
**False Claims Act – Making or Using False Records or Statements to**
**Cause Claim to be Paid**
**31 U.S.C. § 3729(a)(1)(B)**

91.     The allegations of the preceding paragraphs are re-alleged as if fully set forth below.

92.    Through the acts described above and otherwise, Defendant and their agents and employees knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims, in violation of 31 U.S.C. § 3729(a)(1)(B), in order to get false or fraudulent claims paid and approved by the United States Government.

93.    As a result of Defendant's conduct, the United States Government has been harmed by an amount to be determined at trial, and is also entitled to statutory penalties.

**COUNT III**
**False Claims Act – Making or Using False Records or Statements to**
**Conceal, Avoid and Decrease Obligation to Repay Money**
**31 U.S.C. § 3729(a)(1)(G)**

94.    The allegations of the preceding paragraphs are re-alleged as if fully set forth below.

95.    Through the acts described above and otherwise, in violation of 31 U.S.C. § 3729(a)(1)(G), Defendant and their agents and employees knowingly made, used, or caused to be made or used false records and statements to conceal, avoid, and decrease Defendant's obligation to repay money to the United States Government that Defendant improperly or fraudulently received. Defendant also failed to disclose material facts that would have resulted in substantial repayments to the United States Government.

96.    As a result of Defendant's conduct, the United States Government has been harmed by an amount to be determined at trial, and is also entitled to statutory penalties.

## VI.    REQUEST FOR RELIEF

WHEREFORE, Relator Nicolas Moreno requests that judgment be entered against Defendant Wells Fargo ordering that:

1.    Defendant cease and desist from violating the False Claims Act, 31 U.S.C. § 3729, *et seq.*;

2.      The Court enter judgment against Defendant in an amount equal to three (3) times the amount of damages the United States Government has sustained as a result of Defendant's actions, as well as a civil penalty against Defendant for each violation of 31 U.S.C. § 3729, plus any increase as specified by Congress;

3.      Relator be awarded the maximum amount allowed pursuant to the False Claims Act, 31 U.S.C. § 3730(d).

4.      Relator be awarded all costs and expenses of this action, including attorneys' fees, costs, and expenses pursuant to 31 U.S.C. § 3730(d).

5.      The United States and Relator recover all such other relief as the Court deems just and proper.

Date: December 4, 2019               Respectfully submitted,


                        By: /s/ *Mark Hanna*
                        Mark Hanna (DC Bar No. 471960)
                        Nicolas Mendoza (Pro hac forthcoming)[1]
                        Murphy Anderson PLLC
                        1401 K Street NW, Suite 300
                        Washington, DC 20005
                        Phone: (202) 223-2620
                        Fax: (202) 223-8651
                        mhanna@murphypllc.com
                        nmendoza@murphypllc.com

                        Ann Lugbill (DC Bar No. 462850)
                        Murphy Anderson PLLC
                        2406 Auburn Avenue
                        Cincinnati, OH 45219
                        Phone: (513) 784-1280
                        Fax: (877) 784-1449
                            ****
                        1401 K Street NW, Suite 300

---

[1] Admitted to practice in Massachusetts. License to practice in the District of Columbia pending. Supervised by principals of the firm who are members of the District of Columbia Bar.

Washington, DC 20005
Phone: (202) 223-2620
Fax: (202) 223-8651
alugbill@murphypllc.com


## VII.   REQUEST FOR JURY TRIAL

Relator hereby demands a trial by jury.


/s/ Mark Hanna
Counsel for Relator